### Maxwell Ginning Company et al. v. A. V. Wallan.

Decided July 3, 1909.

**Cotton Compress—Negligence—Insufficient Evidence—Assumed Risk.**

In an action against a ginning company for damages for personal injuries received while operating a round bale cotton compress, evidence reviewed, and held insufficient to show any defect in the press for which defendant would be liable, but sufficient to show that plaintiff assumed the risk of operating the machine if it was defective.

Appeal from the District Court of Taylor County. Tried below before Hon. J. H. Calhoun.

*Wagstaff & Davidson,* for appellants.—The court erred in refusing appellants' first special instruction requesting a peremptory charge in their favor. Continental Oil & Cotton Co. v. Scott, 112 S. W., 107; Smith v. Armour, 84 S. W., 675.

*Ben L. Cox* and *Grogan & DeBogory,* for appellee.—The court did not err in not giving appellants' requested peremptory instruction, for the reason that it was a question of fact as to whether plaintiff (appellee) was foreman of all the machinery and was in charge of the round-bale press upon which he was injured, and it was also a question of fact as to whether plaintiff knew that he would be injured if he placed his hands between the rollers, and it was also a question of fact as to whether plaintiff assumed the risk of working in and around said press, there being testimony in the record to controvert all of these propositions. Howard Oil Co. v. Farmer, 56 Texas, 301; Hillsboro Oil Co. v. White, 54 S. W., 432; Galveston Oil Co. v. Thompson, 13 S. W., 60; Missouri Pac. R. R. Co. v. Callbreath, 1 S. W., 622; St. Louis & S. F. Ry. Co. v. Vestal, 86 S. W., 790; Missouri, K. & T. Ry. Co. of Texas v. Kennedy, 112 S. W., 339.

SPEER, Associate Justice.—Appellee received certain injuries while in the employ of appellants for which he sued and recovered judgment in the sum of twenty-five hundred dollars, from which judgment this appeal is prosecuted. At the risk of being tedious we set out the testimony of the witnesses illustrating the character of the accident. The plaintiff testified as follows:

"In the summer of 1907 I was employed by Robert W. Maxwell to work for the Maxwell Ginning Company, and my work was to begin about the middle of August. I was to be foreman and to have charge

of the hands and machinery, except a certain round-bale press which the company .was having put in. I told Mr. Maxwell that I was familiar with all the machinery except this round-bale press, and that I knew nothing about it. He stated that a man from the round-bale press factory would come to run this press and that I would not have to operate it. I was to receive seventy-five dollars per month. The gin did not begin running as early as we expected, and after it had run for a while Mr. Maxwell told me that owing to the shortness of the crop we could not run with a full crew. At first I was running the gin stands and the square-bale press, but later in the season we agreed that we ought to cut down the force, and could dispense with the fireman easier than any other man, so I fired and ran the square-bale press. This was very heavy labor on me, as I had to go back and forth from the boiler-room to the gin-room. The round-bale press was started to work about the middle of September. The man came from the factory to run the round-bale press, and worked about two months and quit, and I hired George Combs to take his place at the round-bale press, and Combs ran it until about the 15th or 20th of December. Mr. Robert W. Maxwell, who had general charge of the gin company's business, on account of sickness of his relatives, spent nearly all of December, 1907, in Alabama, and Combs and I had a misunderstanding and he quit his job. I did not have time to hunt up another man, especially since round-bale men were · scarce, and to keep the machinery from stopping I got a green man and put in my place; I took the round-bale press till I could get the new man familiar with the machinery, when he was to take the round-bale press and I was to go back to the square-bale press and firing. We worked this way two or three days· and Mr. Maxwell returned from Alabama. He did not procure another man, and if we ran at all it was necessary for me to continue at the round-bale press. We lacked only a day or two of being through ginning for the season, and I continued to work there for about three days after he returned, up to the time I was hurt on the 28th day of December. Combs and this man that I hired to fire after Combs quit were the only hands that I had ever hired. Maxwell had hired the others. I had authority to hire hands. We worked most of the season with a crew of three men when six would have constituted a full crew. When Maxwell left for Alabama about December 1st he sent me a letter and told me to take charge of the business and run everything till he got back. Up to the time that Combs quit us I had never examined the round-bale press; had practically no opportunity to do so, as I was too busy. When Combs quit I thought I would take it and do the best I could with it till Maxwell came back. When he returned he made no other arrangements and I continued to work there. My recollection is that he told me to continue to operate that press—at least that was my impression, and there was no one else there to operate it—and on the particular day that I was hurt he directed me to make what cotton was then in the gin-house into round bales, and we were on the last bale when I was hurt. This round-bale press was so constructed as to compress or roll the cotton into bales by four cylinder rollers working close together, two above and two below, the bottom of the lower one being about

three feet above the floor and the space under it, where the bales were allowed to drop out after being compressed was a little more than three feet long and about three feet high. The walls of the building and the position of the press and its construction were such that you could not see well under the press so as to study the construction of it. These four large compression rollers were each about twenty-two inches in diameter and thirty-six inches long, and when the press was running the cotton from the condenser passed between the top rollers into the space between the four rollers and they rolled so as to roll it into a round bale about thirty-six inches long and twenty inches in diameter. These rollers were so geared that they would yield or spring apart as the bales increased in size or neared completion. When the press was running, if you got under it you could not determine how the rollers were running or how it was constructed, owing to the fact that some cotton and some dust were falling out thereunder which would get in your eyes when you looked up. The few days that I had been working at the round-bale press furnished all of the knowledge I had of it, as my observation of it previous to that time had been limited to simply noticing how the other employes had operated it. The press was defective, but I could not tell wherein the defects lay, owing to my lack of familiarity with it, but I knew it to be defective because it would continually let some of the cotton fall out under the press instead of carrying it in its proper course into the bale. I never considered it dangerous except about the top where the cotton went in. R. W. Maxwell had not warned me that it was dangerous in any way. On the day that I got hurt I was reaching under the press and pushing some loose cotton that had fallen down up between the rollers so it would go on into the bale. I could not see thereunder very well, but this was the customary way to get the cotton back. This was the method I had observed Combs and the factory man to use, and I had pushed the cotton back this way myself a great many times. R. W. Maxwell had been around and observed me doing it in this way and had never warned me of any danger. While pushing up the cotton in this way my left hand was caught in the rollers, my arm pulled in and broken in several places, and my shoulder crushed, my back skinned and my head mashed. . . . At the time I was hurt I presumed that it was safe for me to put the cotton back in the way that I was doing. I knew that if I put my hand in between the rollers while they were running that I would get hurt. I knew that the machinery was heavy and the pressure very great, but I did not know that I could get my hand in the rollers. I thought there was a shield or guard under there to prevent my hand from coming in contact with the rollers. I never told Robert W. Maxwell nor any one else that I was injured through my own negligence. I never looked to see if there was a shield under the rollers to prevent one's hand from getting between the rollers. I had never worked with a press like this one and had never seen one with a shield under the rollers. When the press is in position and a bale is finished it is gotten out of the press by allowing it to drop between the two bottom compression rollers to the floor under the press. I do not know how the bale when finished could drop out between the bottom rollers if there was a shield there

sufficient to prevent loose cotton from dropping down while the bale was forming, unless the shield was in some way removed. I have been running and managing gin plants for more than ten years, and I understand ordinary ginning business very well, but I have not run a round-bale press. There was nothing to prevent me from seeing whether or not there was a shield there to keep one's hand from getting between the rollers if I had gotten down under the press and looked up at the rollers, but one operating the press could not see whether or not there was a shield unless he did get down and examine it, as the rollers would prevent his seeing it unless it were entirely below the rollers. There was nothing to prevent a person from getting down under the compression rollers if he wanted to do so. These compression rollers do not revolve rapidly. I am thirty-eight years old. I employed George Combs and you might say I discharged him."

George Combs testified: "While running the round-bale press the bat of cotton going into the press and being rolled into a bale would sometimes break in two, and owing to the construction of the press some of the cotton would drop out between the lower rollers and fall down under the press, and it was necessary to pick it up and push it back up between these two lower rollers to keep it going in the right direction. There was no shield or guard under the press to catch the cotton and keep it from falling out, nor to keep objects from coming in contact with the rollers from the bottom side of the press. There was no danger of a person coming in contact with those rollers under the bottom unless he got under there. I never saw a shield on or under a press to keep the cotton from falling out between the lower rollers. I do not know how a shield could be placed to keep the cotton from sometimes falling down between those rollers, nor how the cotton could be pushed back between the rollers if there was a shield there. While I was operating that press I picked up the cotton that fell down there with my hands and pushed it up against the rollers and let them take it into the bale. I could have pushed it up with a stick, but I always placed it up there with my hands and was careful not to put my hand between the rollers. I suppose Mr. Wallan had seen me so place the cotton between the rollers, but he gave most of his attention to other parts of the work there. . . . I was familiar with that round-bale press. I did not consider it dangerous except as all presses are dangerous if you get caught in them. This press was not out of repairs, but it was not very satisfactory for the reason that it was so constructed that when cotton was being rolled and compressed into a bale it would frequently drop a part of the cotton down between the lower compression rollers, and it would have to be picked up and fed into the press again. It was easiest to feed it in from the bottom. The cotton passed from the gin-stands in a sheet or bat and passed into the round bale press, going down between the two top rollers, and was rolled into a bale between four large compression rollers that rolled the same way and rolled the cotton into a round bale, and when finished the two lower rollers were by the operator opened wider apart and the bale dropped down through the opening onto the floor through the same space that the cotton was disposed to fall through while the bale was being formed or compressed. When I was down under the

press the rollers could be plainly seen and the loose cotton could be easily placed between them. They revolved slowly."

Robert W. Maxwell testified: "I hired Mr. Wallan to act as manager of that ginning business and to have general charge of the machinery and of the hands, with full authority to employ and discharge hands. Mr. Wallan represented to me when I hired him that he was familiar with the machinery and that he knew how to run it, and I gave him no warning as to danger because I understood him to be experienced. The round-bale press was installed in September, 1907, by the manufacturers of such presses, and they kept a man to run it for about a month or two, and after he left Wallan hired a man named George Combs to run it. The round-bale press does not belong to us, but belongs to the manufacturers. This round-bale press contained four compression rollers in a frame parallel with each other, two above and two below, said rollers being about thirty-six inches long, twenty-two inches in diameter, and being placed in a horizontal position with automatic appliances to adjust them to the varying size of the bale, which is rolled between the four rollers, and when near completion it holds the four rollers apart distributed equally around the bale. The bottom of the two lower rollers is about thirty inches above the gin floor. When a bale is completed the two lower compression rollers are drawn further apart and the finished bale drops on the floor and is rolled out. These rollers were slightly corrugated and all revolved in the same direction, and when the press was empty they nearly touched each other, except there was a small space between the two upper rollers through which the sheets or bat of cotton from the gin-stands passed down into the space between the four rollers, where it was rolled into a round bale. Occasionally cotton would drop down between the lower rollers onto the floor, or the bat or sheet of cotton would get broke and would run down between the bottom rollers to the floor. The operators of the press picked it up and stuck it back between the rollers. There was no shield or guard on the lower compression rollers to prevent cotton from falling out nor to prevent objects from coming in contact with the rollers from below. The rollers were visible from below and I know of no way that a shield could be practically placed there. . . . I did not put plaintiff to working or operating the round-bale press nor tell him to operate it. He began it and ran it of his own accord. There was nothing between the rollers and the floor and they could be easily seen—were open to view. There was no shield placed under or between the compression rollers to prevent the cotton from dropping down between them to the floor. I do not know how a shield could be placed there that would prevent the cotton from falling down between those bottom rollers when the bat or sheet broke. There might be a shield to keep it from falling on the floor, but such a shield would not prevent a person from putting his hand up between the rollers, or if the shield were placed up so close to the rollers as to prevent the cotton's falling away from the rollers it would have to be removed before the cotton that fell on to it could be pushed up between the rollers. This cotton that fell down between those rollers could have been pushed up between them with a stick, but the operators generally used their hands. The compres-

sion rollers were plainly visible. Any one stooping down and picking up the cotton that fell down between them could not help seeing them if he would look up. They were two and one-half or three feet above the floor. . . . This round-bale press was not out of repairs, nor was the machinery out of order or in need of repairs. The spilling out of the cotton between the compression rollers was the result of the plan it was made on and would occur with any press like that if the cotton was dry. I knew of no dangers about that press that were not open and visible. Any person could see that the rollers would crush his arm or hand if he let them be drawn into it. Its working had not been entirely satisfactory during the season on account of its dropping out the cotton."

Upon this testimony we conclude that the evidence is insufficient to show any defect in the press for which appellants would be liable. It is undisputed that the press was not out of repair and that the dropping of the cotton was not the result of a defect at all. But if mistaken in this, we are further of opinion that the evidence is insufficient to support the verdict and judgment in appellee's favor upon the issue of assumed risk. It appears from the testimony of appellee himself that he was perfectly familiar with any supposed defects in the press and knew very well that it would occasionally drop cotton onto the floor, and that it was necessary to replace the same between the rollers, and necessarily, as a man of mature years, he knew the danger incident to placing his hand between the heavy compression rollers of the size and power these are shown to be. If a shield was practicable and its absence a defect in the construction of the press, he admits he knew of this defect, and we see no way to escape the conclusion that he assumed the risk of the very injury received by him.

For the insufficiency of the evidence to support the verdict and judgment in the two particulars mentioned the judgment is reversed and the cause remanded.

*Reversed and remanded.*